UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARCOS RAMIREZ-GARCIA,

                  Petitioner,                      Case No. 08-12051
                                                    Honorable David M. Lawson

v.

DEBRA SCUTT,

                  Respondent.
_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

Petitioner Marcos Ramirez-Garcia, presently confined at the Macomb Correctional Facility in New Haven, Michigan, has filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The petitioner was convicted of second-degree murder, Mich. Comp. Laws § 750.317, and possession of a firearm during the commission of a felony (felony firearm), Mich. Comp. Laws § 750.227b, in the Wayne County, Michigan circuit court and sentenced to prison terms of 20 to 40 years for second-degree murder and a consecutive two-year term for the felony firearm charge. The petitioner alleges that his custody is unconstitutional because he did not have effective trial counsel, his conviction was not supported by sufficient evidence, and the prosecutor committed misconduct. The respondent has filed an answer to the petition asserting that the petitioner's claims lack merit because the decision of the Michigan Court of Appeals rejecting those claims did not result in an unreasonable application of clearly established Supreme Court law. The Court agrees. Therefore, the petition will be denied.

I.

This case arises from the shooting death of Fabian Ponce-Mejia in the early morning hours of March 28, 2004.  The victim, 23 years old, was with a friend, Fernando Sanchez, at the Los Galanes restaurant and bar in southwest Detroit until about 1:40 a.m.  The men left Los Galanes and went to another nearby bar, El Comal, where they stayed for about 15 minutes.  Upon leaving, the victim began walking with Sanchez and a third, unidentified friend to Sanchez's van.  As the men crossed Vernor, they were passed by a black Dodge Stratus containing three men.  The men in the car shouted things at the victim and his companions in Spanish.  The victim shouted back at the men, and Sanchez told the victim to be quiet.

Sanchez, the victim, and the victim's friend walked down an alley toward Sanchez's van. The men then separated.  Sanchez continued toward the van while the victim and his friend turned and walked back up the alley.  Minutes later, Sanchez heard three or four shots from what he believed was one gun.  Sanchez got into his van and drove around the block.  From his van, Sanchez saw the victim lying on the ground in the alley.  He recognized the victim because of his red shoes. Sanchez parked the van and returned to the location where the victim was lying.  By the time he got there, the police had arrived.

Gerardo Zuniga also heard the gunshots that night.  Zuniga had been at Los Galanes earlier that night and left Los Galanes approximately ten minutes after the victim departed.  Zuniga was sitting in his truck near the restaurant when he heard three or four gunshots.  He saw a 1993 or 1994 model black car containing three Mexican men turn left from an alley and speed down 24th Street. Zuniga drove his truck to the alley and saw the victim on the ground.  Zuniga flagged down a police officer and led him to the victim's body.

-2-

The medical examiner testified that the victim died of gunshot wounds to his right chest, right leg, right back, and left back.  Four spent 9 mm. bullets were recovered from the victim's body. Three were 9 mm. hollow point bullets that had been fired from the same gun.  The fourth bullet was not a hollow point bullet and had been fired from a different gun.  A spent 9 mm. casing was found in the alley near the body.

A search warrant was executed at 8390 Longworth Street in Detroit.  Officer Rudy Zuniga testified that he saw the petitioner, Marcos Ramirez-Garcia, standing outside the house.  As Officer Zuniga approached and yelled "police," the petitioner ran inside the house.  Officer Zuniga ordered the petitioner to come outside; the petitioner complied and was arrested outside the residence.  Inside the house, the police found a bulletproof vest bearing graffiti possibly associated with the Surenos and Muertos 13 gangs, a holster, and two photographs depicting people making gang signs with their hands.  The police also recovered two .38 caliber handguns and twenty rounds of .38 caliber ammunition.  The firearms examiner tested the handguns and found that neither of them had fired the 9 mm. bullets recovered from the victim's body.

At trial, the prosecution offered testimony by a police officer that the Surenos, the Muertos 13, and the Latin Counts were gangs in southwest Detroit.  The Muertos 13 and the Latin Counts united at some point to "take down" the Surenos, but later the Surenos became part of the Muertos 13.  The colors of Latin Counts were red and black, the colors of the Surenos were blue and black, and the colors of the Muertos 13 were gray and black.

The petitioner was interviewed in Spanish by Officer Moises Jimenez on September 17, 2004, following his arrest.  The petitioner told Officer Jimenez that he lived at 8390 Longworth Street.  Jimenez used a waiver of rights form written in Spanish to advise the petitioner of his

*Miranda* rights.  The petitioner signed the form and orally waived his rights.  Jimenez reduced the interview to a statement written in Spanish that the petitioner signed.

In the written statement, the petitioner asserted the following.  The petitioner went to the International Club with "Chino" in Chino's black Dodge on March 28, 2004.  "Chino" was identified as co-defendant Miquel Perez-Hernandez.  They got into a fight with some Counts at the club.  The petitioner and Chino then left the club with David Tapia and went "cruising through Vernor."  As they passed El Comal they saw a guy coming out of the alley.  Chino said "very much Count, whore," and then fired three or four shots.  Trial Tr., Feb. 9, 2005, at 161.  The petitioner "got down."  *Ibid.*  When asked if he had fired his gun, the petitioner said that he had a .25 revolver and that he "only fired toward the sky" and "upwards" when the "guy was on the ground" because he did not want his companions to say that he was afraid.  *Id.* at 162.  The three men then quickly fled to the freeway.  The petitioner said that he did not know the victim and that the victim "wasn't even in red."  *Ibid.*  The petitioner said that he did not want to kill the victim and did not know that Chino was going to shoot someone.

Prior to trial, the petitioner moved to exclude his statement on the ground that it was given in violation of his *Miranda* rights.  The trial court held an evidentiary hearing.  At the hearing, Officer Jimenez testified that he had read the petitioner his *Miranda* rights in Spanish, that the petitioner waived those rights both orally and in writing, and that the petitioner never asked to speak to an attorney.

The petitioner testified at the hearing through an interpreter that he had completed middle school and could read and write the Spanish language "more or less."  Mot. Hr'g Tr., Dec. 16, 2004, at 25.  The petitioner denied having been read his rights by Officer Jimenez.  The petitioner

-4-

acknowledged that his signature appeared at the bottom of the Spanish-language waiver of rights form, but he testified that he had not read the form and only signed it because Officer Jimenez told him that he could go home if he did so. The petitioner also testified that Officer Jimenez threatened to have him beaten if he did not sign the papers. Following the hearing, the court found that the prosecution had established by a preponderance of the evidence that the statement was given voluntarily and knowingly following administration of *Miranda* rights.

The petitioner was tried jointly with codefendant Miquel Perez-Hernandes before separate juries on charges of murder and felony firearm. At trial, the state introduced evidence of phone calls made by the petitioner from jail. The recordings were played at trial with an interpreter translating the petitioner's words for the jury. In this translation, the petitioner is said to have stated that "the pistol that I had they don't even have in evidence," and "[b]ut about the guy that died, the pistol doesn't have anything to do with it." Trial Tr., Feb. 9, 2005, at 168. The petitioner said that the police threatened him. He stated "[i]f anything else, they are going to charge me with having a gun." *Id.* at 171. He said that his comrade "said things that weren't true but no matter what I never said that I killed him." *Id.* at 173. The petitioner also stated that "I never accepted that I killed him." *Ibid.* He said that "[m]y comrade accepted that he had done it," and "if we cannot change the papers, he is gonna blame — he is gonna take the blame. Then he's going to take the blame. He's going to say that he and another guy did it." *Id.* at 173, 175-76. The petitioner stated that "they told me the guy doesn't have .22 caliber bullets," and "from my comrade they got another gun. And they didn't find anything on me I think." *Id.* at 177.

A second translation of the recorded telephone conversations was prepared by the interpreter after she took the recording home overnight. This translation was admitted on the stipulation of the

-5-

parties.  According to this translation, the petitioner said that he did not "confess that I killed him."
Trial Tr., Feb. 10, 2005, at 65.  "I am only saying that I had a gun, but the gun I was carrying it's
no longer there.  There is no evidence.  The guy that died does not have bullets from my gun."  *Id.*
at 64.  The petitioner said that he believed would get probation or be incarcerated for about 16
months or be deported to Mexico.  The petitioner said that he signed the "papers" because the police
officer threatened him.  *Id.* at 70-71.  The petitioner said that "they are going to try to change what
I said . . . but if it's not possible, then I will be charged for having a gun or carrying a .22."  *Id.* at
65.  The petitioner stated, "I didn't confess that I killed him.  It's the truth on my mother.  I was only
there."  *Ibid.*  The petitioner said that his "comrade" "accepted everything," and "if the papers
cannot be changed, he is going to blame himself and he is going to say that he and the other guy did
it and I will come out clean."  *Id.* at 65-66.

The jury convicted the petitioner of second-degree murder and felony firearm.  On March
2, 2005, the trial court sentenced him to the prison sentence recited earlier.

The petitioner filed a direct appeal, arguing that there was insufficient evidence to support
his conviction for second-degree murder; the verdict was against the great weight of evidence;
prosecutorial misconduct denied him his right to a fair trial; he was denied effective assistance of
trial counsel; and the trial court improperly denied his motion for a directed verdict of acquittal on
the charge of first-degree murder.  On January 23, 2007, the Court of Appeals affirmed the
petitioner's conviction and sentences.  *People v. Ramirez-Garcia*, No. 261408, 2007 WL 162520
(Mich. Ct. App.  Jan. 23, 2007).  The court concluded that sufficient evidence supported his
conviction of second-degree murder under an aiding and abetting theory and the jury verdict was
not against the great weight of the evidence.  The court also rejected the petitioner's claim that

prosecutorial misconduct denied him a fair trial.  Finally, the court of appeals rejected the petitioner's claim presented in a separate *pro se* brief that his trial counsel had been constitutionally ineffective for failing to use an interpreter to consult with the petitioner before trial and before the evidentiary hearing held on his motion to suppress his pretrial statement.  The Michigan Supreme Court denied leave to appeal on July 30, 2007.  *People v. Ramirez-Garcia*, 479 Mich. 861 (2007) (table).

The petitioner timely filed a petition for habeas corpus raising three claims:

I.    Petitioner was denied effective assistance of trial counsel (6th Cm. U.S. Const.) and a fair trial (5th and 14th Am. U.S. Const.) when trial counsel failed to consult with Petitioner with the aid of an interpreter for trial and prior to filing motions to suppress post-arrest statement and for failing to file motion for separate trials.

II.   Petitioner was denied his 14th Amendment right to due process of law under the United States Constitution, where his second-degree murder conviction was not supported by evidence, to prove beyond a reasonable doubt that Petitioner was guilty of committing or aiding and abetting the murder.

III.  Petitioner's 6th and 14th Amendment rights to a fair trial and due process of law under the United States Constitution were violated where the prosecutor's flagrant and non-flagrant statements which consisted of a pattern of improper arguments, rendered the trial fundamentally unfair.

Pet. at 3.

The respondent filed a response, asserting that each of the petitioner's claims were considered and rejected by the Michigan courts, and that these rejections were reasonable under clearly established United States Supreme Court precedent.

II.

The provisions of Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), which govern this case, "circumscribe[d]" the standard of review federal courts must apply when considering an application for a writ of habeas

-7-

corpus raising constitutional claims, including claims of ineffective assistance of counsel.  *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003).  As amended, 28 U.S.C. § 2254(d) permits a federal court to issue the writ only if the state court decision on a federal issue "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or it amounted to "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)-(2); *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998).  Under that review standard, mere error by the state court does not justify issuance of the writ; rather, the state court's application of federal law "must have been objectively unreasonable."  *Wiggins*, 539 U.S. at 520-21 (quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2000) (internal quotes omitted)).  Additionally, this Court must presume the correctness of state court factual determinations.  28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."); *see also West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (stating that "[t]he court gives complete deference to state court findings of historical fact unless they are clearly erroneous").

The Supreme Court has explained the proper application of the "contrary to" clause as follows:

> A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . .
>
> A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [the Court's] precedent.

*Williams*, 529 U.S. at 405-06.

-8-

The Supreme Court has held that a federal court should analyze a claim for habeas corpus relief under the "unreasonable application" clause of § 2254(d)(1) "when a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case." *Id*. at 409. The Court has explained that an unreasonable application of federal law is different from an incorrect application of federal law. Under that language, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. The Supreme Court has continued to emphasize the limited nature of this review. In its recent unanimous decision in *Harrington v. Richter*, --- U.S. ---, 131 S. Ct. 770 (2011), the Court reiterated that the AEDPA requires federal habeas courts to review state court decisions with "deference and latitude," and "[a] state court's determination that a claim lacks merit precludes habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* at 785-86 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

The distinction between mere error and an objectively unreasonable application of Supreme Court precedent creates a substantially higher threshold for obtaining relief than *de novo* review. The AEDPA thus imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be "given the benefit of the doubt." *Renico v. Lett*, --- U.S. ---, ---, 130 S. Ct. 1855, 1862 (2010) (finding that the state court's rapid declaration of a mistrial on grounds of jury deadlock was not unreasonable even where "the jury only deliberated for four hours, its notes were arguably ambiguous, the trial judge's initial question to the foreperson was imprecise, and the judge neither asked for elaboration of the foreperson's answers nor took any other measures to confirm the foreperson's prediction that a unanimous verdict would not be reached") (internal

quotation marks and citations omitted)); *see also Bray v. Andrews*, 640 F.3d 731, 737-38 (6th Cir.

2011); *Phillips v. Bradshaw*, 607 F.3d 199, 205 (6th Cir. 2010); *Murphy v. Ohio*, 551 F.3d 485,

493-94 (6th Cir. 2009); *Eady v. Morgan*, 515 F.3d 587, 594-95 (6th Cir. 2008); *Davis v. Coyle*, 475

F.3d 761, 766-67 (6th Cir. 2007); *King v. Bobby*, 433 F.3d 483, 489 (6th Cir. 2006); *Rockwell v.

Yukins*, 341 F.3d 507, 511 (6th Cir. 2003) (en banc).  Moreover, habeas review is "limited to the

record that was before the state court."  *Cullen v. Pinholster*, --- U.S. ---, 131 S. Ct. 1388, 1398

(2011).

A.

The petitioner first argues that he was denied effective assistance of trial counsel and a fair

trial where his trial counsel failed to consult with an interpreter before trial and before filing a

motion to suppress his post-arrest statement, and failed to file a motion for separate trials.

To show a violation of the Sixth Amendment right to effective assistance of counsel, a

petitioner must demonstrate "that counsel's performance was deficient" and "that the deficient

performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *accord

Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005).  The petitioner must show "that counsel made

errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the

Sixth Amendment." *Strickland*, 466 U.S. at 687.

The Michigan Court of Appeals rejected the petitioner's claim of ineffective assistance of

counsel on direct appeal as follows:

> Garcia argues he was denied the effective assistance of counsel because his counsel
> failed to use an interpreter when he consulted with him before trial.  Garcia claims
> that his counsel's failure to consult with him with the aid of an interpreter before
> counsel moved for an evidentiary hearing prevented him from participating in his
> defense.  We disagree.
> . . .

-10-

"Defendants who face incarceration are guaranteed the right to counsel at all critical stages of the criminal process by the Sixth Amendment."  *People v. Willing*, 267 Mich. App. 208, 219, 704 N.W.2d 472, 480 (2005).  An evidentiary hearing was conducted to determine the voluntariness of Garcia's statement.  During this time a Spanish-speaking interpreter was provided.  We are unable to determine if counsel used the aid of an interpreter during his initial meetings with Garcia; however, the record shows that an interpreter was provided during Garcia's evidentiary hearing. During the evidentiary hearing, Garcia testified regarding the voluntariness of his statement and he maintained that he was coerced and threatened when he made the statement.  Garcia also claimed that he was not read his constitutional rights and that he signed several papers without reading the contents.  Officer Moises Jimenez also testified regarding Garcia's statement and, based on the testimony presented, the court found that the statement was voluntarily given.

Because defense counsel was able to move for an evidentiary hearing based on Garcia's claims of threats and coercion, Garcia was able to communicate with his counsel regarding the involuntariness of his confession before the evidentiary hearing.  It also appears from the record that Garcia was able to convey to the court that he believed that his interrogation was improperly conducted.  Although Garcia argues that he requested an attorney but the police continued to conduct the interrogation, Garcia has failed to present any evidence that he was unable to convey to his attorney this claim at the same time he informed his attorney regarding the threats and coercion.  Garcia has failed to show that counsel was ineffective.  Even if counsel failed to use the aid of an interpreter, Garcia was able to convey to counsel the need to move for an evidentiary hearing and Garcia was able to present to the court his allegations of threats and coercion during the hearing.  Garcia has failed to show that counsel was ineffective, and therefore, Garcia has failed to show that he was denied a fair trial.

*People v. Ramirez-Garcia*, No. 261408, 2007 WL 162520, at *5-7  (Mich. Ct. App. Jan. 23, 2007).

The Michigan Court of Appeals thus found as a factual matter that the record did not support the petitioner's allegation that he was unable to consult with his attorney adequately for the purpose of preparing for the evidentiary hearing.  Instead, the Michigan appellate court found that the record of the evidentiary hearing showed that regardless of whether the petitioner's counsel had used an interpreter to communicate with his client before the hearing, the petitioner was able to convey to his counsel his factual version of the interrogation.  The court's holding is not contrary to or an

unreasonable application of the *Strickland* standard. The petitioner therefore is not entitled to relief on this claim.

The petitioner also asserts that his trial counsel was ineffective for failing to request separate trials. The Michigan Court of Appeals rejected this claim, finding that the petitioner was not entitled to separate trials and therefore his counsel was not ineffective for failing to seek separate trials. *See Ramirez-Garcia*, 2007 WL 162520, at *5-7 . It is well-settled that "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas review." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *see also Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (holding that habeas relief does not lie for perceived state law errors); *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975) (confirming that state courts are the final arbiters of state law). Therefore, the petitioner is not entitled to habeas relief on this claim.

B.

The petitioner next contends that he was denied his right to due process of the law because his second-degree murder conviction was not supported by sufficient evidence. "[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). The critical inquiry on habeas review of the sufficiency of the evidence to support a criminal conviction is

> whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

-12-

*Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (internal citations and footnote omitted). A federal court may not reweigh the evidence or redetermine the credibility of the witnesses. *See Marshall v. Lonberger*, 459 U.S. 422, 434 (1983). "It is the province of the factfinder to weigh the probative value of the evidence and resolve any conflicts in testimony." *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003) (citing *Neal v. Morris*, 972 F.2d 675, 679 (6th Cir. 1992)). A habeas court must defer to the fact finder for its assessment of the credibility of witnesses. *Ibid.* (citing *Gall v. Parker*, 231 F.3d 265, 286 (6th Cir. 2000)). The Court need not be convinced that the petitioner is actually guilty beyond a reasonable doubt, provided there is sufficient evidence in the record to support the jury's verdict. *Walker v. Russell*, 57 F.3d 472, 475 (6th Cir. 1995).

The sufficiency of evidence "standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law," *Jackson*, 443 U.S. at 324 n.16, and through the framework of 28 U.S.C. § 2254(d), *Martin v. Mitchell*, 280 F.3d 594, 617 (6th Cir. 2002).

Applying the *Jackson* standards, the Michigan Court of Appeals rejected the petitioner's insufficiency of evidence arguments as follows:

> To prove second-degree murder, the prosecution must show that there was: (1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse. *People v. Fletcher*, 260 Mich. App. 531, 559, 679 N.W.2d 127, 144 (2004). . . .

> To support a finding that a defendant aided and abetted a crime, the prosecutor must show: (1) the crime charged was committed by the defendant or some other person, (2) the defendant performed acts or gave encouragement that assisted the commission of the crime, and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time [the defendant] gave aid and encouragement. *People v. Robinson*, 475 Mich. 1, 6, 715 N.W.2d 44, 47-48 (2006).

The evidence was sufficient for a jury to conclude that the elements for a second-degree murder conviction were proven under an aiding and abetting theory. The evidence showed that, while Fabian Ponce-Mejia and Fernando Sanchez were walking to Sanchez's van, a black Dodge Stratus with three men inside drove by shouting at them. Mejia exchanged words with the men. Sanchez and Mejia separated while walking to the alley. Moments later Sanchez heard gunshots and saw Mejia lying on the ground. Mejia died from multiple gunshot wounds. The medical examiner concluded that there were at least two handguns involved in Mejia's shooting.

The prosecution presented evidence connecting Garcia to the shooting. In Garcia's post-arrest statement, which was read into evidence, Garcia maintained that he and "Chino" got into a fight with rival gang members at the International Club that night. Hernandez is also known as "Chino." Garcia maintained that he, "Chino" and David Tapia left the club and went driving around in "Chino's" black Dodge near El Comal. Garcia said that a guy from the alley walked toward the car when "Chino" stated, "very much Count, whore and he fired the shots at him." Garcia said "Chino" fired about three or four shots. Garcia also claimed he fired a shot from his .25 caliber handgun in the air because he did not want the others to think he was afraid.

Although Garcia denied his involvement in the shooting, the evidence was sufficient to prove second-degree murder. Mejia was shot several times while walking in an alley near El Comal and he died from multiple gunshot wounds. Thus, the evidence was sufficient to show that a death occurred. The evidence was also sufficient to show that the death was aided by an act of Garcia with malice and without justification or excuse. *See Fletcher, supra.* According to Garcia, after feuding with rival gang members, they went driving around El Comal and during this time words were exchanged between them and Mejia. Thereafter, shooting occurred and Mejia was dead.

Garcia admitted that he shot a .25 caliber handgun that night, but maintained that he only shot the handgun in the air and after Mejia was already on the ground. Although the police failed to recover a nine millimeter weapon during the search, the evidence sufficiently showed that Garcia possessed or had access to at least three different caliber weapons, which would lead to the inference that he could have access to more weapons or that he was untruthful about the weapon he used that night. Evidence was presented showing that at least two nine millimeter handguns were involved in Mejia's death and that the police recovered two .38 caliber handguns, 20 rounds of .38-caliber ammunition, four spent rounds, and a bulletproof vest and photographs evidencing gang affiliation from the home where Garcia was arrested. Despite Garcia's claim that he did not know that "Chino" was going to shoot anyone that night and that the man was already on the ground when he fired his gun, a reasonable juror could conclude that the evidence presented showed otherwise.

-14-

Sufficient evidence was presented to show that Garcia acted with malice. Malice may be inferred from the facts and circumstances of the killing. *People v. Kemp*, 202 Mich. App 318, 322, 508 N.W.2d 184, 186-87 (1993). This Court has found that "the trier of fact may make reasonable inferences from direct or circumstantial evidence in the record." *People v. Perkins*, 262 Mich. App. 267, 268-269, 686 N.W.2d 237, 239 (2004). By Garcia's admission, he, Hernandez, and Tapia drove around El Comal, around 2:00 a.m., after feuding with rival gang members and they had loaded weapons. They were also driving in a car without interior or "dome" lights on. Words were exchanged between the men and Mejia and, thereafter, the shooting occurred. Garcia's actions of driving around 2:00 a.m., with a loaded weapon and after feuding with rival gang members, and then exchanging words with a suspected rival gang member, was sufficient to infer malice, i.e., intentionally setting in motion a force likely to cause death or great bodily harm. *See Bulmer, supra.*

The evidence failed to show that Garcia's actions were justified. No evidence was presented which showed that Mejia initiated the encounter or that Garcia acted in self-defense. *See People v. Riddle*, 467 Mich. 116, 119, 649 N.W.2d 30, 34 (2002). When the shots were fired, Garcia, Hernandez, and Tapia were in the car and Mejia was walking near the alley. Although Garcia claimed Mejia was walking toward the car when the shots were fired, it is unlikely that Mejia posed an immediate threat to the men because there was no evidence of close range firing and no weapons were recovered from Mejia's body or the surrounding area. Based on the evidence presented, it is reasonable for a jury to infer that deadly force was used at a time when Mejia was not an immediate threat.

Although no evidence was presented showing that Garcia directly killed Mejia, sufficient evidence was presented which showed that Garcia aided and abetted in the killing. Garcia was Hernandez's passenger and they drove around El Comal around 2:00 a.m., with loaded weapons and after feuding with rival gang members. The evidence further showed that the men exchanged words with Mejia, who they suspected was a rival gang member. Thereafter, Garcia alleged that Hernandez fired several shots. "A defendant is criminally liable for the offenses the defendant specifically intends to aid or abet, or has knowledge of, as well as those crimes that are the natural and probable consequences of the offense he intends to aid or abet." *Robinson, supra.* The evidence presented was sufficient to support Garcia's second-degree murder conviction, i.e., that Mejia was shot and killed, by an act caused by Garcia, with malice, and without justification or excuse. *See Fletcher, supra.*

*Ramirez-Garcia*, 2007 WL 162520, at *1-3.

-15-

The Michigan Court of Appeals's holding that the record contained sufficient evidence to prove beyond a reasonable doubt the petitioner's guilt of second-degree murder was not contrary to federal law, an unreasonable application of federal law, or an unreasonable determination of the facts. The court applied the correct legal standard in addressing the question of sufficiency of the evidence and applied it with reference to the elements of the crime. Evidence was presented from which a reasonable jury could find all the elements of second-degree murder on an aiding and abetting theory. Therefore, the petitioner is not entitled to habeas relief on this claim.

C.

In his third claim, the petitioner asserts that the prosecutor engaged in misconduct that rendered his trial unfair. He argues that the prosecutor committed misconduct when she mis-characterized the evidence in her opening statement to imply that the petitioner admitted to shooting at the victim; when she improperly introduced evidence of the guns, bulletproof vest, and photographs seized at the house where the petitioner was residing at the time of his arrest; and stated during closing argument that the victim did not have a weapon. The Michigan Court of Appeals rejected each of these claims on the merits.

"Claims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004) (citing *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003)). Prosecutorial misconduct will form the basis for habeas relief only if the conduct was so egregious that it rendered the entire trial fundamentally unfair based on the totality of the circumstances. *Caldwell v. Russell*, 181 F.3d 731, 736 (6th Cir. 1999) (stating that "[p]rosecutorial misconduct may warrant habeas relief only if the relevant misstatements were so egregious as to render the entire trial fundamentally unfair to a degree tantamount to a due process deprivation"),

-16-

*abrogated on other grounds by Mackay v. Dutton*, 217 F.3d 399, 406 (6th Cir. 2000). The first question to consider is whether the prosecutor's conduct or remarks were improper. *Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006). If they were, the court must decide whether the improper acts were so flagrant as to warrant relief. *Ibid.* Flagrancy depends on four factors: 1) whether the actions "tended to mislead the jury or prejudice the defendant"; 2) whether the actions were isolated or represent a pervasive course of conduct; 3) whether the acts represent a deliberate attempt to affect the outcome of the case; and 4) the overall strength of the case. *Millender*, 376 F.3d at 528.

The determination whether the trial was fundamentally unfair is "made by evaluating the totality of the circumstances surrounding each individual case." *Angel v. Overberg*, 682 F.2d 605, 608 (6th Cir. 1982) (citing *Hayton v. Egeler*, 555 F.2d 599, 604 (6th Cir. 1977)). The Court focuses on "'the fairness of the trial, not the culpability of the prosecutor.'" *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (quoting *Serra v. Michigan Dep't of Corr.*, 4 F.3d 1348, 1355 (6th Cir. 1993)). "The Supreme Court has clearly indicated that the state courts have substantial breathing room when considering prosecutorial misconduct claims because 'constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise.'" *Slagle*, 457 F.3d at 516 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 645 (1974)).

The Michigan Court of Appeals rejected the petitioner's claim of prosecutorial misconduct as follows:

> Garcia argues that the prosecutor mischaracterized the evidence by implying during opening statement that he admitted to shooting at the victim. During Garcia's post-arrest statement, he denied shooting at Mejia, but he admitted that he fired his gun "towards the sky" after Mejia was already on the ground. Although the prosecutor's statement was only partially substantiated, Garcia has failed to show plain error requiring reversal. This Court has held that "when a prosecutor states that evidence will be submitted to the jury, and the evidence is not presented, reversal is not warranted if the prosecutor did so acting in good faith." *People v. Wolverton*,

-17-

227 Mich. App. 72, 75, 574 N.W.2d 703, 704-05 (1997). The record does not show that the prosecutor acted in bad faith when she made the statement. More importantly, Garcia's post-arrest statement discussing his role in the shooting was admitted into evidence, and the court instructed the jury that the lawyers' statements and arguments were not evidence and that it should "only accept things that the lawyers say that are supported by evidence or by [its] own common sense and general knowledge." Even if the challenged remarks had any prejudicial potential, the trial court's instructions were sufficient to eliminate any prejudice that may have stemmed from the prosecutor's statement. *See People v. Daniel*, 207 Mich. App. 47, 57, 523 N.W.2d 830, 837 (1994).

Garcia next argues that the prosecutor improperly introduced into evidence the guns, ammunition, casings, bulletproof vest, and photographs seized at the Longworth home. We disagree.

Garcia was arrested near the entrance of the Longworth home and the police recovered from the home two .38 caliber handguns, 20 rounds of .38-caliber ammunition, four spent rounds, and a bulletproof vest and photographs evidencing gang affiliation. Although Mejia died from bullets shot from nine millimeter handguns and not a .38 caliber weapon, the prosecution properly introduced the evidence. Garcia admitted to shooting a gun the night Mejia was killed, but there were inconsistencies regarding the weapon that he used. During Garcia's post-arrest statement, he maintained that he used a .25 caliber when he fired in the air. However, during Garcia's taped telephone conversation, he maintained that he used a .22 caliber handgun. When the Longworth home was searched two .38 caliber weapons were seized. Because Mejia was killed with bullets from nine millimeter handguns, and Garcia claimed he used a .25 or .22 caliber weapon, the evidence relating to the .38 caliber handguns was introduced to show that Garcia was not being truthful about the weapon that he used that night.

The evidence seized at the Longworth home was also admitted to further the prosecution's theory that the shooting was gang related and that Garcia assisted in the shooting based on his gang affiliation. The police recovered a bulletproof vest with graffiti art and photographs evidencing gang affiliation from the Longworth home. Even if the evidence was of "marginal relevance, prosecutorial misconduct cannot be predicated on good-faith efforts to admit evidence." *People v. Noble*, 238 Mich. App. 647, 660, 608 N.W.2d 123, 131 (1999). The prosecution's theory was that the shooting was gang related, and therefore, the evidence was intended to further the prosecution's theory. Garcia has failed to show that the prosecutor introduced the evidence in bad faith thus his claim of prosecutorial misconduct is without merit.

Garcia further argues that the prosecutor mischaracterized evidence during closing argument. We disagree. During closing argument, the defense objected to the

-18-

prosecutor's argument that Mejia did not have a weapon. The statement was not improper because the evidence supported the statement. No evidence was presented showing that Mejia had a weapon that night and no weapons were recovered at the scene of the shooting. The prosecutor was "free to argue the evidence and any reasonable inferences that may arise from the evidence." *See Ackerman, supra.*

*Ramirez-Garcia*, 2007 WL 162520, at *4-5.

The court's holding was not an unreasonable determination of the facts, or contrary to or an unreasonable application of Supreme Court precedent. The prosecutor's opening statement indicating that the petitioner acknowledged in his statement to the police that he shot "in the direction of" the victim, while arguably improper, was isolated rather than flagrant. There is no evidence that the prosecutor's statement was a deliberate misstatement of the evidence, as it occurred only once in the opening statement and was not repeated in closing. It was also seized upon and refuted by the defense counsel in his opening, which lessened any possible prejudice resulting from the prosecutor's opening statement. The prosecutor's closing argument that the victim did not have a gun was not improper because it was supported by evidence, and prosecutors may "argue the record, highlight any inconsistencies or inadequacies or the defense, and forcefully assert reasonable inferences from the evidence." *Cristini v. McKee*, 526 F.3d 888, 901 (6th Cir. 2008). As to the evidence seized in the search, the petitioner admitted that he resided at the location where the evidence was seized, and the evidence was relevant to the prosecution's theory that gang affiliation motivated the crime. Therefore, the prosecutor's conduct in seeking its admission was not improper. The petitioner is not entitled to habeas relief on this claim.

III.

The state courts' decisions in this case were not contrary to federal law, an unreasonable application of federal law, or an unreasonable determination of the facts in light of Supreme Court

-19-

precedent.  The petitioner has not established that he is presently in custody in violation of the Constitution or laws of the United States.

Accordingly, it is **ORDERED** that the petition for a writ of habeas corpus [dkt #1] is **DENIED**.

                                    s/David M. Lawson
                                    DAVID M. LAWSON
                                    United States District Judge

Dated:  July 7, 2011

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 7, 2011

                        s/Deborah R. Tofil
                        DEBORAH R. TOFIL